Filed 7/1/14  P. v. Harris CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| THE PEOPLE, | B249580 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA394823 ) |
| v. | |
| MARION HARRIS, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge. Affirmed.

Tracy L. Emblem, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Marion Harris of two counts of shooting at an occupied vehicle (counts 1 & 3; Pen. Code, § 246), possession of cocaine base for sale (count 2; Health & Saf. Code, § 11351.5), possession of a firearm by a felon (count 4; Pen. Code, § 29800, subd. (a)(1)), and four counts of assault with a firearm (counts 5-8; Pen. Code, § 245, subd. (a)(2)).  As to counts 4 through 8, the jury found that Harris personally used a firearm in the commission of the offenses.  (Pen. Code, § 12022.5.)  Harris subsequently admitted he suffered a prior conviction for a narcotics offense.  (Health & Saf. Code, § 11370.2, subd. (a).)  The trial court sentenced Harris to state prison for an aggregate term of 25 years and 4 months.  We affirm.

## FACTS

### The First Shooting (Counts 1, 5 & 6)

Rhonda Stamp was Harris's ex-girlfriend.  They had a child when they were together.  In February 2012, their child was two-years old, and Stamp was pregnant by Harris with another child.  Deborah Watson dated Stamp's son.  Watson knew Harris from prior interactions with him at family gatherings.

On February 29, 2012, at about 1:00 p.m., Stamp and Watson were driving on 50th Street near Hooper Street when they saw Harris standing in the middle of the street, talking to someone in a car.  As Stamp's car approached Harris, he appeared to become "upset."  Watson saw Harris start "rearranging . . . , like, moving his clothing" near his waist area.  At the same instant, Stamp put her head down and began to accelerate the car.  Watson also put her head down.  Watson believed that she heard "possibly one gunshot."  Stamp and Watson immediately drove to a nearby police station to report the incident.  Stamp went inside while Watson waited in the car.  Stamp was not in the station "long;" when she exited the police station, she had a business card.

### The Second Shooting (Counts 3, 7 & 8)

After leaving the police station, Stamp and Watson drove to Taco Mama at the corner of Vernon and Hooper Streets.  They ordered food and then went to the car to wait for their number to be called.  Watson saw Harris drive into the parking lot in a black-top sedan and pull into a spot right next to Stamp's car.  Stamp immediately ducked and

2

drove off at a high rate of speed. Watson also put her head down; she heard what appeared to be another gunshot. Stamp and Watson drove to the police station for the second time. After getting out of the car at the police station, they noticed what appeared to be a bullet hole in the car.

Los Angeles Police Officer Jin Kwon met with the two women. They told him that two shootings had taken place. Officer Kwon spoke with Stamp first while Watson was within earshot. Stamp looked angry when she recounted the details of the two shooting incidents. Both Stamp and Watson told Officer Kwon that Harris was the shooter. Stamp had Harris's photograph identification card in her possession, and showed it to Officer Kwon.

After speaking with Stamp, Officer Kwon asked Watson whether Stamp's report was true, and Watson replied, "Yes." He also asked Watson to clarify some of the things, and her answers were in line with what Stamp said. Watson specifically told Officer Kwon that she saw Harris on the street when she was in the car with Stamp on 50th Street going westbound towards Hooper, and Harris produced a handgun and fired two gunshots at their car. Watson further told Officer Kwon that she was at a taco stand at Hooper and Vernon when she saw Harris again; Harris tried to open the door, but it was locked. Stamp started to drive away when Harris fired one shot at them, hitting the car.

Officer Kwon then went outside to inspect the car that Stamp and Watson had been driving. He took a picture of the rear driver's side wheel well. At trial, Officer Kwon testified that, based on his training and experience, the damage appeared to come from a gunshot. Officer Kwon's partner looked at the hole to see if there were any bullet fragments lodged inside the hole, but he did not find any.

After Stamp signed the report, Officer Kwon and his partner conducted a follow-up investigation at the two shooting locations reported by Stamp and Watson. They first went to the one on 50th Street between Hooper and Ascot. They did not locate any casings, evidence of bullet strikes, or eyewitnesses. Officer Kwon testified that, in his experience, people are often unwilling to talk to police about shootings. Officer Kwon and his partner then went to the taco stand at Hooper and Vernon to "see if anyone else or

3

anything is there, casings, bullet fragments, and see if there are any eyewitnesses." They did not locate any casings or evidence of bullet strikes. Officer Kwon's partner spoke with Samuel Valle, who worked at the taco stand. At trial, Valle testified that he was preparing food in the front for customers when he heard "a loud bang," which appeared to be a gunshot. He dove to the ground. Valle testified that it sounded like the bang came from somewhere on the street. He did not see anybody firing a gun and he did not call 9-1-1.

### *Further Investigation*

On March 1, 2012, Los Angeles Police Officer Kevin Raines and his partner, Officer Rose, were assigned to investigate the shootings. In Officer Raines's presence, Officer Rose had several phone conversations with Stamp and also at some point with Watson. After speaking with Officer Rose, Watson was asked to provide a statement.

At trial, Watson was shown a copy of the statement that included a photo of Harris in the corner and a statement, "This is the man who shot at the car on 50th between Ascot and Hooper, and also the second time at Taco Mama on Hooper and Vernon. As I was sitting in the car, he shot at my tire." Although the signature on the statement identifying Harris as the shooter was almost identical to Watson's signature on a subpoena, Watson insisted at trial that she did not sign the statement, and contended that Stamp wrote the document. She further testified that she did not give a West Globe Avenue address as her home address, and that her signature was photocopied. Watson admitted that her life could be in danger "if word got out to the street" that she signed a statement identifying Harris as the shooter.

On June 27, 2013, Watson had a brief conversation with Officer Raines when Officer Raines's partner served her with a subpoena. Watson told Officer Raines that she saw Harris reach towards his waist and pull out a handgun when she and Stamp were driving on the 50th Street on February 29, 2012. She also told Officer Raines that she saw Harris running after Stamp's car with a gun in his hand. When she and Stamp was waiting in the car for food at Taco Mama, Watson saw Harris "produce a handgun" and

4

point it at the car. Watson told Raines that she knew Harris and had seen him "several times at family gatherings," so she recognized him when she saw him.

### *Harris's Arrest with Drugs and the Recorded Jail Cell Conversation*

On March 6, 2012, Officers Raines and Rose arrested Harris as he was parking a car on 55th Street. As the officers were walking Harris to the sidewalk, Officer Raines saw a plastic baggie containing an off-white solid material, later determined to be 3.98 grams of cocaine in the form of cocaine base, fall from Harris's right pants leg onto the ground. Officer Raines seized the baggie and searched Harris, who had "a small baggie of marijuana in his front pants pocket and $303 in miscellaneous denominations in his right front pocket."

At the police station, Officers Raines and Rose placed Harris in a room and had a conversation with him for about 15 minutes. Harris was *Mirandized*[1] and agreed to make a statement. He told the officers, "The cocaine, yeah, that shit's mine, but I ain't involved in no shooting." Harris refused to make any further statements. During the conversation, Officer Raines became familiar with Harris's voice, which was "distinct" because it was "deeper, edgier." Harris was booked into the Metropolitan Detention Center on March 6, 2012.

On March 7, 2012, Jumanee Buard was arrested as part of an unrelated investigation conducted by Detective Frettlohr, and booked into the Metropolitan Detention Center. Buard and Harris were placed into a cell together and their conversation was recorded. On March 12, 2012, Officers Raines and Rose received a copy of the recording, and listened to it. The officers heard Harris make a number of incriminating statements.[2]

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

[2] The taped jailhouse conversation included numerous uses of "street" vernacular. At trial, a police expert testified to the meaning of various comments heard on the tape.

In May 2012, the People filed an information charging Harris with the offenses summarized above.  The charges were tried to a jury in July 2012.  Watson testified at trial; Stamp did not.  On July 16, 2012, the jury returned verdicts as summarized above.

## DISCUSSION

## I.    The Recorded Jail Cell Conversation Was Properly Admitted

Harris contends all of his convictions must be reversed because the trial court prejudicially erred by admitting the recorded jail cell conversation.  Harris argues that the conversation between him and Buard was recorded after he was arraigned and appointed counsel, and because Buard was acting as an agent for the police, the conversation was inadmissible.  Specifically, Harris argues the police violated *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*) by placing him in a recorded jail cell with a cellmate who knew the same acquaintances and who was charged with similar charges, thus creating a situation likely to induce Harris to make incriminating statements.  We disagree.

### A.  *Massiah* Error

Under *Massiah,* "when, after adversarial judicial criminal proceedings have been initiated and in the unwaived absence of counsel, a government agent deliberately elicits from a defendant incriminating statements, those statements are inadmissible at a trial on the charges to which the statements pertain."  (*People v. Dement* (2011) 53 Cal.4th 1, 33; and see also *Fellers v. United States* (2004) 540 U.S. 519, 523; *Maine v. Moulton* (1985) 474 U.S. 159, 170, 180; *Massiah, supra,* 377 U.S. at p. 206.)  "[A] Sixth Amendment violation occurs when the government intentionally creates or knowingly exploits a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, but not when the government obtains such statements through happenstance or luck."  (*People v. Dement*, *supra*, 53 Cal.4th at p. 33; and see *Maine v. Moulton, supra*, 474 U.S. at p. 176; *United States v. Henry* (1980) 447 U.S. 264, 274.)

"'Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and

6

(2) deliberately elicited incriminating statements.'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 67 (*Coffman*); *People v. Dement*, *supra*, 53 Cal.4th at pp. 33-34.)

When the informant is a jailhouse inmate, the requirement of agency is not satisfied when law enforcement officials "merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance." (*In re Neely* (1993) 6 Cal.4th 901, 915.) "A preexisting arrangement, however, need not be explicit or formal, but may be inferred from evidence of the parties' behavior indicative of such an agreement." (*Coffman*, *supra*, 34 Cal.4th at p. 67.) Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government. (*In re Neely*, *supra*, 6 Cal.4th at p. 915.)

As to the requirement of deliberate elicitation, actual interrogation by an informant is not required in order to satisfy this element. (*United States v. Henry, supra,* 447 U.S. at pp. 270-273.) Thus, where a fellow inmate, acting pursuant to a prearrangement with the government, "stimulates" conversation with a defendant relating to the charged offense (*id.,* at p. 273), or actively engages the defendant in such conversation (*In re Wilson* (1992) 3 Cal.4th 945, 954), the defendant's right to the assistance of counsel is violated under the *Massiah* rule. The defendant has the burden of demonstrating that "the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459.)

## B. Buard as an Agent of the Police

Outside the presence of the jury, Harris's defense counsel moved to exclude the recorded statements on Sixth and Fourteenth Amendment grounds. Defense counsel argued that the purported reason for the recorded conversation of Buard was that the police were investigating Buard as a "potential suspect." Defense counsel asserted that he "ran" Buard and that it appeared he was never charged in any homicide investigation. Defense counsel advised the court that Buard was in custody for possessing or selling

7

cocaine, and that Buard was released from jail a few days later, after the prosecutor's office offered Buard "a simple possession and DEJ." Defense counsel further contended that Buard "may not have been DEJ-eligible." Defense counsel thought it raised "a lot of questions" regarding whether Buard was acting as an agent of the police to get a statement out of Harris.

The prosecutor argued the police reports indicated that the recording occurred due to an investigation that was unrelated to Harris's case. Buard was being investigated for something "much more serious" than "just a simple dope case." The prosecutor stated that investigating homicide detective in Buard's case did not know who Harris was until the detective listened to the recorded conversation. The investigating detective then took the initiative to contact the investigating officer in Harris's case.

The trial court ruled that Harris had not established that Buard was acting as any sort of government agent, and there was no basis to exclude the entirety of the recorded statements Harris made.

We agree with the court and find that Harris failed to carry his burden of demonstrating a violation of his Sixth Amendment right. Harris did not present any evidence showing that there was a preexisting agreement between Buard and the police. Harris essentially argued that the fact that Buard was released a few days after the recorded conversation took place, and the fact that he had been offered a simple possession and DEJ even though Buard might not have been DEJ-eligible, raised "factual questions" as to whether Buard was acting as an agent for the police. In our view, the trial court reasonably determined that the recorded statements were admissible and Harris's Sixth Amendment right was not violated, given the absence of any evidence that the police had encouraged Buard to elicit information or indicated that to do so would be to his benefit, or that Buard's release from jail was other than in the normal course for his charged offenses. (See *Coffman*, *supra*, 34 Cal.4th at p. 68.)

Harris further contends that the court should have declared a mistrial after Officer Raines testified that "Most of [jail cells] are not recorded . . . If you wish to have your suspect placed in a recorded cell, you go down to jail division or call and speak to the

8

watch commander or jail sergeant and request that." We find that Harris's argument lacks merit because there was no evidence that Buard was purposefully placed into a recorded cell with Harris even though the police knew which cells were recorded. Moreover, Harris never moved for mistrial at trial and had waived it even assuming there was an error. (*People v. Jennings* (1991) 53 Cal.3d 334, 383.)

We also disagree with Harris that Buard was not required to be an informant agent to make the evidence inadmissible. As stated above, the informant's agency is the first requirement that the defendant must establish to suppress the statements and prove a violation of his or her Sixth Amendment right. Without establishing the agency requirement, Harris failed to demonstrate that the trial court erred in admitting the recorded statements even if Buard deliberately elicited statements from Harris in the jail cell. (See *Coffman*, *supra*, 34 Cal.4th at p. 67.) Moreover, even assuming, arguendo, that Buard was acting as the police's agent, the transcript of the recorded conversation shows that Harris mostly volunteered the incriminating statements and Buard did not attempt to elicit these statements from Harris. Because Buard appeared to be a mere passive listener or "listening post," Harris's constitutional right was not violated and therefore his statements were admissible. (See *Kuhlmann v. Wilson*, *supra*, 477 U.S. at p. 459.)

## II.     Additional Claims of Error Related to Recorded Jail Conversation

Harris contends the admission of police expert testimony about the meaning of his recorded statements, the admission of the recorded tape itself, and a highlighted 58 page transcript of the tape, together with the prosecutor's argument that Harris had failed to explain his innocence in closing argument, created reversible error in the use of the taped jailhouse statements. We disagree.

Harris's recorded statements contained a number of words and phrases that were beyond the common experience of the jurors, as it included numerous uses of "street" vernacular. At trial, a police expert testified to the meaning of various comments heard on the tape. It was appropriate for the trial court to admit expert testimony to explain those terms to the jury. (Evid. Code, § 801, subd. (a).) We agree with Harris that case law has recognized that a police officer's testimony often carries an aura of special

9

reliability and credibility (see, e.g., *United States v. Gutierrez* (9th Cir. 1993) 995 F.2d 169, 172), but we are not persuaded that this required exclusion of the expert police testimony at Harris's trial. The test for reviewing a trial court's ruling to admit expert testimony is abuse of discretion (*People v. Catlin* (2001) 26 Cal.4th 81, 131) and we are not persuaded that the trial court acted unreasonably. The conversation heard on the jailhouse tape is not readily understandable in common experience, without the expert's explanatory testimony.

Harris argues that the admission of the transcript of the jailhouse tape recording, coupled with part of CALCRIM No. 358, created reversible error. Specifically, Harris objects to the last sentence of CALCRIM No. 358, which instructed the jury: "Consider with caution any statements made by the defendant tending to show his guilt unless the statement was written or otherwise recorded." Harris essentially argues that the written transcript, coupled with CALCRIM No. 358, lessened the cautionary principles normally attached to a defendant's incriminatory statements. We are not persuaded there was instructional error. The entirety of CALCRIM No. 358 correctly relayed to the jury the legal principles that, when evidence of a defendant's incriminating statements is presented through the trial testimony of a witness, the evidence should be viewed with caution, but, when evidence of a defendant's incriminating statements is presented through the defendant's own written or recorded statements, it is up to the jurors to decide how much importance to give to the statements in determining its verdict. Assuming there was instructional error, we are not persuaded that reversal is required. In our view, as analyzed above, the evidence of Harris's guilt was predominated by the eyewitness testimony of victim Watson.

Finally, we find Harris's argument unconvincing that, during the prosecution's closing argument, the prosecutor improperly commented on his failure to take the stand and to explain his recorded conversation with Buard, in violation of *Griffin v. California* (1965) 380 U.S. 609, 615. *Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand. (See *People v. Hovey* (1988) 44 Cal.3d 543, 572.) Specifically, it is error for a prosecutor to state that certain evidence is

10

uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 757–758; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1339; *People v. Hughes* (2002) 27 Cal.4th 287, 371-372.)

At trial, Harris failed to object to the statement that he now asserts constitutes error under *Griffin*, and therefore we find Harris has waived his right to complain on appeal. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1050–1051; see also *People v. Hughes*, *supra*, 27 Cal.4th at p. 372.) Even considering the merits, we find that the prosecutor's argument, viewed in it's entirety, show the prosecutor referring to the recorded conversation and Harris's failure to tell Buard that he was innocent or to deny his guilt to Buard. In other words, the prosecutor was discussing the state of the evidence — the jailhouse conversation — and not commenting on Harris's decision not to testify at trial. Accordingly, we conclude that the prosecutor did not commit any *Griffin* error.

## III.     Continuance for New Trial Motion

Harris contends his case must be remanded for a hearing on a motion for new trial. Specifically, Harris argues the trial erred when it denied his post-conviction motion for a continuance, which was coupled with a motion to compel a potential witness to turn over a surveillance video. Harris argues a continuance was appropriate to afford newly retained counsel sufficient the time to prepare a new trial motion. Harris argues his case must be remanded so that his counsel may complete a new trial motion, and to have the motion heard on the merits. We find no error.

### *The Factual Setting*

The charges against Harris were tried to a jury in July 2012. A public defender represented Harris at trial. On July 16, 2012, the jury returned its verdicts. The trial court set the sentencing hearing for August 21, 2012. The sentencing hearing was thereafter continued or trailed a number of times for various reasons as follows. On August 21, 2012 to September 10, 2012. On September 10, 2012, to September 19, 2012. On September 19, 2012 to September 26, 2012. On September 26, 2012 to October 4,

11

2012.  On October 4, 2012 to November 6, 2012.  On November 6, 2012 to November 13, 2012.  On November 13, 2012 to November 15, 2012.

On November 15, 2012, Harris made an oral motion to represent himself. The court granted the motion, and reset the sentencing hearing for December 17, 2012. On December 17, 2012, Harris requested more time to prepare, which the trial court granted.  The court reset the sentencing hearing for January 17, 2013.  On January 17, 2013, Harris requested a 30-day continuance because he had not yet been placed in a pro per module.  The court granted Harris's request for a continuance, but advised that this would be the "final continuance" granted.  The court reset the sentencing hearing for February 20, 2013.

On February 20, 2013, Harris relinquished his pro per status, and the trial court appointed a private attorney, Dakar Diourbel, to represent Harris.  Attorney Diourbel requested a 30 day continuance to prepare for sentencing and a possible motion for new trial.  The court reset the sentencing hearing for March 21, 2013.  On March 21, 2013, the trial court granted a defense motion for a continuance.  At that time, the court advised attorney Diourbel:  "This will be the final continuance."  The court reset the sentencing hearing for April 22, 2013.  On April 22, 2013, the trial court granted a prosecution motion for a continuance.  The court reset the sentencing for May 1, 2013.

On the May 1, 2013 sentencing date, attorney Diourbel filed a defense motion for a continuance.  The motion argued that additional time was needed so that a private investigator could interview the relevant witnesses in the case, and so defense counsel could locate and subpoena a witness to testify at a hearing on an anticipated motion for new trial.  Further, that more time was needed to gather and examine exculpatory evidence.

The trial court found that the motion for a continuance was not timely, but invited attorney Diourbel to explain the "extenuating circumstances" justifying a further continuance.  Attorney Diourbel explained that he was trying to arrange for an unidentified out of state witness to testify at a motion for new trial, and that it was "difficult to coordinate people who have jobs and children."  Defense counsel also

12

explained that he had filed a motion that morning, seeking a court order directing the Fiesta Inn (located on South Central Avenue in Los Angeles) to turn over video surveillance footage. Defense counsel asserted that the video was "very relevant," but did not expressly explain how so. The implied but unstated proposition was that the surveillance footage would show that Harris was at the Fiesta Inn on the day of the shootings.

The trial court denied the defense motion for a continuance. The court found the motion was not timely, and that defense counsel had already been given "ample time to put together any possible motion for new trial." At the same time, the court denied the defense motion directed at the Fiesta Inn. The court did not expressly state reasons for denying the motion. The court indicated that it would "allow a brief continuance for one week if counsel want[ed] to file a sentencing memorandum." The court reset the sentencing hearing for May 13, 2013, and ordered any defense sentencing memorandum to be filed no later than May 9, 2013, "in order to have that considered by the court."

In summary, the jury convicted Harris on July 16, 2012, and the sentencing hearing was eventually set to be heard 10 months later on May 13, 2013.

On May 9, attorney Diourbel filed a sentencing memorandum. On May 10, 2013, attorney Diourbel filed a motion for new trial. The new trial motion argued that alibi witnesses — identified as Arthur Glover, Yana Hayes and "Monique" — had not been called to testify at trial, and that video surveillance footage from the Fiesta Inn would "likely" show Harris's innocence. The motion stated that the manager of the Fiesta Inn was ready to release the video surveillance footage "with a court order" The motion also stated that victims Stamp and Watson had recanted their accusations against Harris. No declaration was submitted from either the manager, Stamp, Watson, or any of the alibi witnesses.

At the hearing on May 13, 2013, attorney Diourbel stated to the trial court that he was not then able to proceed with the motion for new trial due to the unavailability of witnesses. Counsel stated that Stamp was then residing in Arizona, and that, while she wanted to testify on behalf of Harris, she had "transportation issues." Counsel also stated

13

that another witness, Arthur Glover, was in county jail, but was unavailable because he refused to come out of jail. Counsel represented that Glover knew the identity of the "true perpetrator." Counsel did not name the true perpetrator. There was no request for continuance made in the papers filed or at the court hearing on May 13, 2013.

The trial court ruled that it would "not be considering" the motion for new trial because it was "not timely filed," and would "not be considering any document" filed on May 10, 2012 "as a document not timely filed." The trial court then proceeded with the sentencing hearing and sentenced Harris as indicated above.

Section 1050 prescribes the procedures and standards for continuances in criminal cases. Under section 1050, a trial court has broad discretion to grant or deny a request for a continuance to prepare a motion for new trial. (*People v. Alexander* (2010) 49 Cal.4th 846, 934.) To show good cause for a continuance to prepare a motion for new trial, the defendant must demonstrate due diligence. (*Ibid.*)

The record summarized above belies Harris's argument that the trial court abused its discretion by denying a further continuance. The court denied a defense motion for a continuance on May 1, 2013, but then continued the matter to May 13, 2013 in any event to allow the defense to file a sentencing memorandum. On May 10, 2013, Harris filed his motion for new trial. The motion did not include a request for a further continuance; on the contrary, the motion indicated that the defense would present evidence in support of the new trial claims at the time of the hearing then-set to be heard on May 13, 2013. On May 13, 2013, Harris's counsel advised the court that he was "unable to go forward with that motion due to unavailability of [the defense's] witnesses." We do not see another request for a continuance in defense counsel's statements to the trial court at the hearing on May 13, 2013.

To the extent Harris argues the court abused its discretion in denying the request for continuance made on May 1, 2013, any such abuse was of no consequence because the court on that date, its own motion, continued the sentencing hearing to May 13, 2013 in any event. Because there was no request on May 13, 2013, we see no error in denying a further continuance.

14

Apart from these specific elements, the record shows no abuse of discretion in declining a continuance on May 1st or on May 13th or any date. Harris's motions for continuances, and the statements of his counsel, do not include *evidence*, e.g., affidavits of his new trial witnesses, establishing the defense's assertions about the difficulties in obtaining the presence of witnesses for a new trial hearing. There is no evidence in the record detailing the efforts (e.g., dates and procedures) that were made to locate and bring any witness to court, or explaining why such efforts could not have been pursued earlier. And equally important, there is no evidence in the record to show that an additional continuance was likely to be useful, i.e., was likely to produce helpful evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 76.) Harris's presentations did not include *evidence* to show the facts which might make a difference at a new trial. Bald assertions by counsel that evidence exists does not show a likelihood that the evidence would actually be of use at a new trial. The trial court did not abuse its discretion.

In addition, the trial court did not err in ruling that it would not consider Harris's motion for new trial. First, Harris's counsel in practical effect withdrew the motion for the stated reason that he did not have any evidence to present. When a defendant withdraws a new trial motion, the trial court has nothing upon which to act. (*People v. Day* (1988) 201 Cal.App.3d 112, 120.)

Assuming the trial court erred in not conducting a hearing on Harris's new trial motion, we will not reverse because the record on appeal does not demonstrate that a miscarriage of justice ensued. (*People v. Braxton* (2004) 34 Cal.4th 805, 817.) A miscarriage of justice may be found in a no-ruling context on a motion for new trial in either of two circumstances. First, when a reviewing court determines from the record that the defendant's new trial motion should have been granted as a matter of law, or second, when the record persuades that the trial court would have granted the motion and that granting the motion would not have been an abuse of discretion. (*Braxton, supra*, 34 Cal.4th at p. 817.)

Harris's motion should not have been granted as a matter of law because he did not submit evidence tending to show that a new trial would have not been of any benefit. There may possibly be something that could be done by a habeas petition hereafter, but on the record on appeal, there is nothing of substance to support granting a new trial. For the same reason, we are satisfied that the trial court would have granted Harris's motion as a matter of discretion because, again, Harris's motion was not supported by evidence. For example, as to the Fiesta Inn surveillance video, Harris's motion only offered the written statement from his counsel (in the motion's text, not in declaration form) that the video would "likely document[]" that Harris had been present at the Inn on the day of the shootings. No explanation is given as to why such a likelihood existed. Even assuming the video tape could be properly authenticated as to the date of the shooting, there is no statement from any witness saying that they had even looked at the video, let alone possibly identified Harris. A motion for new trial based on newly discovered evidence requires a showing that a different result is reasonably probable. (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) We reiterate again, that there is no *evidence* in the record to support such a conclusion in Harris's current case, only vague speculative assertions.

Further, a motion for new trial based on newly discovered evidence requires a showing that the evidence could not have been discovered and produced at trial with reasonable diligence. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 512.) There is no explanation in the record why Harris could not have discovered the evidence earlier than May 2013. We find this particularly true, when his claim is that it was he who was at the Fiesta Inn; he must have know of his defense from even before trial. If Harris claims he did not learn of the existence of the video surveillance tape until later, he never presented evidence to show how he discovered its existence or explaining why he could not have made the discovery earlier.

Finally, we find no abuse of discretion in the trial court's ruling on May 1, 2013, denying Harris's request for a court order directing the Fiesta Inn to turn over video surveillance. As we have explained repeatedly above, there is no *evidence* in the record

16

on appeal to support the conclusion that there was any material of value on the purported video surveillance tape. In actuality, there is no evidence in the record that such video surveillance tape in fact existed, only statements of counsel that the tape would likely be helpful. Because Harris did not show justification for a court order for production of the evidence, the court did not act unreasonably in denying Harris's motion.

## IV.    Sentencing

Harris contends the trial court improperly sentenced him to the maximum prison term. More specifically, Harris argues the trial court imposed the maximum sentence as a form of sanction because he declined to accept a plea bargain before trial. Further, Harris argues the trial court relied on improper factors in imposing a greater sentence. We find no sentencing error.

Harris is correct that a trial court may not sentence a defendant more harshly for exercising his or her constitutional right to trial. (*In re Lewallen* (1979) 23 Cal.3d 274, 278.) Accordingly, the issue presented to us on appeal is whether the record establishes, either directly or by way of reasonable inference, that this is what occurred in Harris's case. In undertaking an examination of this issue, we are mindful that the mere fact a defendant received a more severe sentence than he or she was offered during plea negotiations "does not itself" support a finding that the defendant was penalized for exercising his constitutional right to trial. (*People v. Szeto* (1981) 29 Cal.3d 20, 35.)

On the day Harris's case was called for trial, the following exchange occurred: "THE COURT: Mr. Harris, sir. I just wanted to bring you out because I like to do this in every case that I have. We're here for trial, sir. If you'd like to go to trial, sir, I guarantee you will get a very fair trial. I kind of want to let you know what it is that you're looking at. [¶] Apparently, in your case, the maximum sentence is 28 years in state prison. The offer that the district attorney made to you at this time is 32 [*sic*] years in state prison, which is a little bit less than half.

"Once again, you have a right to have a trial. If you have a trial, sir, it's going to be a very fair trial, but I can tell you, in going into it in light of the conduct in this case, which is alleged against you, in light of your record, if it

17

doesn't go your way, chances are quite high that you're going to get a lot closer to that 28 years than you are to 13 years.

"If you have any inkling, sir, that you'd like to take an offer where you can serve – save yourself quite a few years in prison, you need to do that right now because once the case goes to trial and once I bring that jury in here, then you're looking at being on the hook for the full 28 years in prison.

"So it's certainly up to you, sir.  If you want to go to trial, you can have a trial, but you can save yourself quite a bit of time if you're thinking about taking the offer at this time.  I'm sure you want to talk about that, but I always like to let the defendants know right upfront how I see the case.

"Do you want to have a chance to talk to you lawyer about it, or is it something that —

"[HARRIS]: No.  I'm not going to take this, nothing like that.

"THE COURT:  Okay.  That's fair enough, sir."

After the jury returned its verdicts, the prosecution filed a sentencing memorandum arguing for imposition of the maximum sentence of 25 years and 4 months in state prison.  The prosecution's sentencing memorandum argued there were a number of factors in aggravation, including, among others, that Harris's crimes involved great violence reflected in the fact that he shot at two victims on two separate occasions, and that he used a firearm, and the victims were particularly vulnerable in that they were targeted without warning and had no means to protect themselves from serious harm.  In sum, the prosecution argued that Harris's actions showed a high degree of viciousness and callousness, reflecting an extreme danger to the community.

At the sentencing hearing, the trial court stated that it was familiar with the case, and that it had read both the prosecution and defense sentencing memoranda.  The court then pronounced sentence as follows:  The court selected count 5 (one of Harris's four convictions for assault with a firearm) as the base term, and imposed the upper term of 4 years.  In imposing high term, the court stated that it found the crime involved great violence, the victims were vulnerable, and Harris had a "very lengthy" criminal history.

18

The court stated that it found no factors in mitigation. The court added a mandatory 10 year term for the firearm enhancement pursuant to section 12022.5, plus a three-year term pursuant to Health and Safety Code section 11370.2, subdivision (a), which Harris had admitted. For counts 6, 7 and 8 (Harris's three remaining convictions for assault with a firearm), the court sentenced Harris to consecutive terms of 1/3 the mid-term, which was 1 year per count, plus consecutive terms of 1/3 of the firearm enhancement, which was another 1 year and 4 months on each count. For count 2 (possession of cocaine base), the trial court sentenced Harris to a consecutive term of 1/3 the mid-term, which was 16 months. The court ordered imposition of sentence stayed as to counts 1 and 3 (shooting at an occupied motor vehicle) and count 4 (possession of a firearm by a felon) pursuant to section 654.

In our view, the record does not show that the trial court punished Harris because he declined the prosecution's plea offer, and opted to go to trial. To the extent Harris's argument is that the trial court's pre-trial comments, recounted in full above, show the court threatened that it was going to impose the maximum sentence on Harris if he did not accept the prosecution's plea offer, we disagree. As we read the record, it shows no more than that the trial court advised him of the maximum possible sentence he could receive after trial, so he could meaningfully assess whether to accept the prosecution's plea offer of 13 years. The trial court's pretrial comments do not have any tendency in reason to show the court punished Harris, posttrial.

This brings us the question of whether there is any evidence from the sentencing hearing to support Harris's argument that the trial court punished him with a longer sentence for deciding to go to trial. Harris's arguments on appeal make no reference to any comments by the trial court at the time of sentencing which might tend to show the court was punishing him for having gone to trial. For this reason, we find Harris's reliance on *People v. Morales* (1967) 252 Cal.App.2d 537 to be unpersuasive. In *Morales*, the trial court stated at the sentencing hearing that it was "'very much disturbed'" the defendant had chosen to go to trial and then not put any effort into putting on a defense. The trial court also stated that, if a defendant did not have a defense but

19

still opted to go to trial, then "'he should suffer some additional sanction.'" (*Id*. at pp. 544-547, fn. 4.) In Harris's case, he points to no comments at his sentencing hearing with such a tenor. On the contrary, all Harris does in his arguments on appeal is point out that the trial court "could have" formulated a shorter sentence that it did. This is not the type of showing which will establish a claim that the trial court punished a defendant for exercising his or her right to trial. (*People v. Szeto, supra*, 29 Cal.3d at p. 35.)

***Other Claims of Sentencing Error***

Within the overall framework of his argument that the trial court punished him at sentencing for exercising his right to go to trial, Harris raises claims of sentencing error, or, perhaps more accurately, selectivity in sentencing. Harris's point is that because these more discrete errors or selectivity resulted in a greater sentence, it is further proof that the trial court punished him for going to trial. We find no such errors or selectivity problems, and, thus, find no sentencing issues tending to support Harris's overall claim that the trial court punished him for going to trial.

1.      *Use of Sentencing Factors*

Harris contends the trial court improperly relied on sentencing factors which did not apply in sentencing him to the upper term on count 5 and to the upper term on the firearm enhancement attached to count 5. We disagree.

The evidence at trial showed that Harris shot at two unarmed victims on two separate occasions. In both instances, the victims were confined in a motor vehicle, and Harris acted without warning. Under these circumstances, we are satisfied that the trial court properly found Harris's crimes to involve great violence and vulnerable victims. (See, e.g., *People v. Esquibel* (2008) 166 Cal.App.4th 539, 558 [unarmed victims in a public park shot at without warning were vulnerable].) The record also supports the trial court's finding that Harris had a lengthy criminal history. Harris was incarcerated in state prison on four separate commitments, and had multiple convictions going back to his days as a juvenile for crimes such as burglary, robbery, gun possession, accessory to murder and sale of narcotics. Based on this record, we cannot say the trial court erred in selecting upper terms as to count 5. Further, the selection of upper terms is certainly not

20

so out of line that it tends to show the court punished Harris more severely because he had exercised his right to go to trial.**3**

Our conclusion is the same as to the imposition of consecutive terms as opposed to concurrent terms. A court has broad discretion to sentence consecutively or concurrently (see *People v. Clancy* (2013) 56 Cal.4th 562, 579), and we see nothing in the record to show the decision to sentence consecutively in Harris's case was based on retaliation for going to trial, rather than based on the seriousness of his offenses.

2.      *Section 654*

Harris contends the trial court "could have" stayed imposition of sentence on counts 7 and 8 (the two of his four convictions for assault with a firearm involving the second shooting at the taco stand). He argues those assault offenses were committed closely in time and place to counts 5 and 6 (the two of his four convictions for assault with a firearm involving the initial shooting on the public street). We disagree.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." Section 654 "is intended to ensure that defendant is punished 'commensurate with his culpability.'" (See *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Accordingly, its protection "has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.'" (*Ibid.*) "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible." (*Ibid.*) If the defendant had only a single intent and all of the offenses were incidental to that one objective, he may be punished only once. If, on the other hand, he harbored multiple criminal objectives, he may be punished for each statutory violation

---

**3**      The trial court did not impose an upper term on Harris's drug conviction; the court imposed 1/3 the mid-term. We thus are unsure how to assess Harris's argument that the court's statements about "a large amount of contraband" affects his argument regarding the length of his sentence.

"'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*Ibid.*) The defendant's intent and objective is a factual question for the trial court, and its determination whether 654 applies is reviewed under the substantial evidence standard of review. (See, e.g., *People v. Petronella* (2013) 218 Cal.App.4th 945, 963-964.)

In Harris's current case, the evidence showed he shot at the victims' vehicle on 50th Street near Hooper Avenue, following which they drove to a local police station where victim Stamp went inside while victim Watson waited in their car. Later, the victims drove to a taco stand at the corner of Vernon Avenue and Hooper Avenue, where they ordered food and then went back to their car to wait. As they were waiting, Harris drove into the parking lot and shot at the victims a second time.[4] The inescapable conclusion from this scenario of facts is that there was a significant break between the two shooting events. These were separate incidents, and Harris without doubt had time after the first shooting incident to consider and reflect before moving to a new location and shooting a second time. Section 654 could not reasonably be applied in Harris's case as to counts 7 and 8. (See, e.g., *People v. Louie* (2012) 203 Cal.App.4th 388, 399; *People v. Lopez* (2011) 198 Cal.App.4th 698, 717-718; *People v. Rosas* (2010) 191 Cal.App.4th 107, 110.) Harris is wrong that the trial court "could have" applied section 654, and, accordingly, the court's failure to do so is not an indication that the court punished Harris for exercising his right to go to trial.

3. *Apprendi*

Harris contends the trial court could not use the aggravating sentencing factors it cited unless the jury made findings as to those factors within the meaning of *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*). We disagree.

---

[4] We may take judicial notice that the Newton Police Station is at 3400 South Central Avenue, a little more than one mile north from Hooper and 50th. From the police station back south to Hooper and Vernon is a little less than one mile. The corner of Hooper and 50th is about seven blocks south of Hooper and Vernon.

*Cunningham* was decided under an earlier sentencing scheme in California which included provisions that made the mid-term the presumptive sentencing choice, and then allowed for a greater sentence based on aggravating circumstances determined by a trial court. In *Cunningham*, the United States Supreme Court ruled that judicial fact finding to increase a sentence violated a defendant's Sixth Amendment right to trial. In response to *Cunningham*, the Legislature changed the sentencing scheme addressed in *Cunningham*, removing the mid-term presumption, and giving trial courts the discretion to impose an upper term sentence without engaging in additional fact finding. (See § 1170, subd. (b).) This change went into effect on March 30, 2007 (*People v. Sandoval* (2007) 41 Cal.4th 825, 836, fn. 2), long before Harris committed the crimes involved in his current case, and long before he was sentenced in his current case.

For the reasons explained above, Harris has no basis for complaining about the imposition of an upper term. The trial court had the authority, as a matter within its discretion, to impose the upper term based on its own assessment of potential aggravating circumstances. We find the trial court did not abuse its discretion because it cannot be said that the trial court's sentencing decision was unreasonable. Because the trial court did no more than what it was allowed to do, we find the trial court's sentencing decision is not further proof that Harris was punished with a greater sentence for exercising his right to go to trial.

## DISPOSITION

The judgment is affirmed.


                                                          BIGELOW, P.J.

We concur:


        RUBIN, J.                    GRIMES, J.


23

**RUBIN, J., Concurring:**

I have signed the majority opinion and agree with its analysis. I write separately only to express my concerns with the following statement by the trial court:

"Once again, you have a right to have a trial. If you have a trial, sir, it's going to be a very fair trial, but I can tell you, in going into it in light of the conduct in this case, which is alleged against you, in light of your record, if it doesn't go your way, chances are quite high that you're going to get a lot closer to that 28 years [the maximum] than you are to 13 years [the plea offer]."

This statement raises in my mind whether the trial court may have prejudged the sentence it would likely give defendant – closer to 28 years than 13 years – before it had heard trial testimony and before defendant had been given an opportunity to argue the sentence post trial. The court's statement obviously did not coerce defendant into taking a plea bargain because he rejected the disposition and was convicted after trial. Although I conclude that the statement did not rise to the level of error and realize it may be typical of statements made by trial courts in plea disposition discussions, I observe that there are unintended risks of either of coercion or prejudging when it is suggested pretrial that post trial a defendant is likely to get a specific sentence, such as something close to the maximum. Nevertheless, I see no error in this case.

RUBIN, J.

1